IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| United States of America : | |
| : | Case No. CR-1-06-084 |
| : | |
| : | District Judge Susan J. Dlott |
| v. : | |
| : | ORDER DENYING |
| Shawn McDaniel : | DEFENDANT'S MOTION TO |
| : | SUPPRESS |
| Defendant : | |

This matter comes before the Court on Defendant Shawn McDaniel's Motion to Suppress (doc. 18) and Supplemental Memorandum in Support of Motion to Suppress (doc. 42). The Court held a hearing on the motion on November 30, 2006 and January 11, 2007. Defendant and the Government submitted supplemental briefs on March 15, 2007 and April 3, 2007 respectively. The matter is now ripe for review. For the reasons that follow, the Court **DENIES** Defendant's motion.

**I.     FACTUAL BACKGROUND**

Defendant McDaniel was arrested on January 29, 2006 after police officers discovered crack-cocaine, related drug paraphernalia, and a .22 caliber pistol on his person. At approximately 8:00 p.m. that evening, uniformed Cincinnati Police Officers Grisby and Putnick[1]

---

[1] At the time of the events described herein, Officer Putnick had been with the Cincinnati Police Department approximately one and a half years. During this time he was assigned to a beat car, patrolling District One, which generally covers the area of Cincinnati known as Over-the-Rhine. Officer Robert Grisby had been with the Cincinnati Police Department for approximately two years, but had just transferred to District One a week prior to the incident. The night in question was the

were patrolling their District One beat in the area of downtown Cincinnati known as Over-the-Rhine. The officers came upon a 2001 Hyundai vehicle that was stopped more than twelve inches away from the left curb on Pleasant Street[2] – a two-car wide, one way street in Over-the-Rhine. Four individuals, including McDaniel, were seated in the stopped Hyundai. Officer Putnick drove his police cruiser up next to the Hyundai on the right side in order to tell the driver to pull over closer to the curb. The Hyundai was so far into the middle of the street that Officer Putnick could barely pull his cruiser next to it and ended up scraping his tires against the right curb.

      Because the police cruiser sat higher than the Hyundai, Officer Putnick had a clear view into the Hyundai. Additionally, the area was lit by a street light. Officer Putnick pulled forward until he was parallel with the rear seat. At that point, he observed Defendant McDaniel, who was seated in the rear driver's side, make a startled expression, turn his body away from the officers toward the left door and stuff something into his waistband with his left hand. Specifically, Officer Putnick testified that when he first pulled up next to the Hyundai, no one in the car appeared to notice him because they were engaged in conversation. When they did notice the police cruiser, all four individuals turned their heads and stared in a blank manner, as if they were surprised by the officers' presence. He then observed McDaniel turn very quickly away from the officers, and make a furtive movement that looked like he was putting something

---

first time that Officer Grisby and Officer Putnick had ridden together.

    [2] Officer Putnick testified that several shootings have occurred at this location, that it is a high crime area, and more specifically that it is a known drug trafficking area.

into his waistband.  Based on this observation and his experience that people often carry firearms in their waistbands, Officer Putnick believed McDaniel was trying to conceal a weapon.[3]

Officer Grisby also observed McDaniel look up in a startled manner and then turn his body toward the door.  To Officer Grisby, McDaniel's actions indicated that may attempt to exit the car and flee.  According to Officer Grisby's testimony, it does not appear that he saw McDaniel make any movement toward his waist.  Nor did Officer Grisby state that he was concerned McDaniel may have been carrying a weapon at that point.  Instead, he was primarily concerned that McDaniel would run.

---

[3] Officer Putnick testified as follows:

| | |
|---|---|
| A. | When I pulled up, they were engaged in conversation with each other, and I pulled up and they didn't know I was there, I guess, or passing by.  They all turned their heads right away and looked at me and just kind of – they gave me a blank stare as if they weren't expecting me to be there. |
| Q. | Specifically to Mr. McDaniel, how did he behave? |
| A. | He – as soon as he looked at us, he immediately turned very quickly away from us and put something in his waistband as to conceal it, and I believed it was a firearm because that's where firearms are – through my experience that I've recovered numerous firearms in people's waistbands; that's just where they – where people that are carrying them that shouldn't keep them.  And I was worried, I was concerned.  That's why I reversed right away. |
| Q. | Okay.  Now, the vehicle – you're in a police car; correct? |
| A. | That's correct. |
| Q. | The vehicle that you were addressing is a Hyundai? |
| A. | I believe so. |
| Q. | A smaller car? |
| A. | It's – yes. |
| Q. | Now, from where you were seated, what kind of vantage point did you have looking at Mr. McDaniel? |
| A. | Well, it was a clear picture.  I mean the Crown Vic sits a little bit higher than the Hyundai does.  And my seat – I typically have my seat – you can adjust it in height.  I just – I had a clear view.  I looked right over at him and I could see him turn and stuff what I believed to be a firearm into his waistband. |

(Tr. 13:6-14:8, Nov. 30, 2006.)

After the officers observed McDaniel's behavior, Officer Putnick reversed the police cruiser to assume a tactically sound position to the rear right side of the Hyundai, and flipped on the rear flashing lights.[4] Officer Putnick then jumped out of the cruiser and directed the occupants of the Hyundai to keep their hands in plain view. Meanwhile, Officer Grisby radioed into dispatch to give their location and advise that they had stopped the police cruiser for an "investigation." (see Tr. 48:23.) Officer Grisby also requested a cover car.[5]

The officers then approached the Hyundai, with Officer Putnick approaching on the left as the lead officer and Officer Grisby approaching on the right in a cover position. Officer Putnick retrieved identification from the driver and McDaniel and explained to the driver why the officers were talking with them. According to Putnick, he was basically engaging them in

---

[4] Because Officer Putnick only turned on the rear strobe lights rather than the front-flashing or 360 degree lights, the cruiser's Mobile Video Recording System ("MVR") was never activated. The MVR is part of the police cruiser's standard equipment. The system involves two components – an audio and a visual component. The visual component consists of a camera that is mounted in plain view on the windshield of the cruiser. The audio component consists of a microphone attached to the officer's uniform as well as a microphone inside the police cruiser.

The MVR is linked with the flashing lights on the top of the police cruiser, such that switching the lights to certain settings automatically activates the MVR. Specifically, there are three settings for the lights. The first setting points the flashing lights to the rear; the second setting rotates the lights 360 degrees; and the third setting points the lights to the front. Switching the lights to the second or third setting simultaneously activates the MVR.

Though it is the policy of the Cincinnati Police Department to record every stop, Officer Putnick explained that the light system and MVR in his cruiser were relatively new and that he mistakenly thought he had activated the MVR by turning the back strobe lights on. The officers did not realize the MVR was never turned on until they had arrested McDaniel and placed him in the cruiser. Accordingly, the majority of the events in question were not captured on video.

[5] According to Officer Grisby, a request for a "cover" car is different from a request for "backup." An officer calls for backup when there is a greater sense of urgency, such as where an individual is threatening an officer or has a gun in his hand. A call for cover occurs in less serious situations, where an officer may simply want a larger police presence on the scene.

conversation in order to wait for another police cruiser to arrive before he got McDaniel out of the car. Shortly thereafter, a third officer, Donald Elsaesser, arrived on the scene.

As soon as Officer Putnick saw Officer Elsaesser pulling up, he asked McDaniel to step out of the Hyundai. McDaniel exited the car and Officer Putnick ordered him to put his hands on the roof of the car. With McDaniel facing the car, Officer Putnick attempted to grab McDaniel's arms and place them behind his back. According to Officer Putnick, McDaniel's right arm stiffened and almost locked. Then McDaniel pulled away from Officer Putnick, but the officer was able to maintain control of McDaniel and handcuffed his arms behind his back.[6]

After handcuffing McDaniel, Officer Putnick patted him down, starting at McDaniel's waist to check for a firearm. Initially, Officer Putnick felt nothing at McDaniel's waist, and so he began to pat down McDaniel's arms. In doing so, Officer Putnick felt a gravel-like substance in McDaniel's right sleeve. Based on his experience, Officer Putnick believed the substance to be crack-cocaine.[7] After recovering the contraband, Officer Putnick performed a search of McDaniel's person and when he went back over the waist area a second time, he felt a gun, which then slid down McDaniel's left pant leg to the ground. After seeing the weapon, Officer Putnick yelled "gun" to alert the other officers, and Officer Elsaesser recovered and secured the

---

[6] While this was taking place, Officer Grisby was around the other side of the car. Because he was watching the passengers on the right, Officer Grisby did not observe in detail Officer Putnick's interaction with McDaniel. Nonetheless, Officer Grisby testified that he hear Officer Putnick raise his voice and tell McDaniel to put his hands behind his back. At that point Officer Grisby started to pay more attention to McDaniel. His testimony as to Putnick's pat-down of McDaniel and the subsequent events largely corroborated Putnick's testimony.

[7] Officer Putnick testified that he has made numerous arrests – more than he could count – involving crack-cocaine.

.22 caliber pistol. In addition to the gun and the crack-cocaine, Officer Putnick also found a digital scale and $667 in cash on McDaniel.

## II. ANALYSIS

McDaniel moves to suppress all evidence flowing from the allegedly unconstitutional search and seizure, including the gun, crack-cocaine, money, and any statements that he made. With his motion, McDaniel argues that the officers lacked reasonable suspicion to pat him down. The Government responds that the stop and frisk was entirely within the bounds of Terry v. Ohio, 392 U.S. 1 (1968).

An officer may "stop and briefly detain a person for investigatory purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 329 U.S. 1, 30 (1968)). In all cases, the scope of the Terry stop must be "reasonably be related to the circumstances that initially justified the stop." United States v. Richardson, 949 F.2d 851, 856 (6th Cir. 1991). The reasonableness of the stop depends on two factors: "(1)whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion; and (2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." United States v. Hardnett, 804 F.2d 353, 356 (6th Cir. 1986). An officer conducting a Terry stop may also frisk the individual for weapons whenever there is an objectively reasonable belief that the subject may be armed. See Terry, 392 U.S. at 30 (holding that during the course of a Terry stop an officer "is entitled for the protection

of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him").

In the instant case, McDaniel does not dispute the validity of the initial stop. Instead, McDaniel claims the officers exceeded the scope of the stop by asking him to step out of the vehicle and conducting a pat-down of his person. The Government argues that the officers had reasonable suspicion to detain and pat-down McDaniel based on the following factors: (1) McDaniel was sitting in a car that was impeding traffic on a narrow street in a notoriously high crime area; (2) he appeared startled and quickly turned away upon seeing the officers; and (3) he made furtive body movements near his waistband, suggesting he was attempting to hide a gun or other contraband in his pants. McDaniel challenges the Government's position from several angles, first arguing that Officer Putnick's testimony that he believed McDaniel was armed is not credible and then arguing that even if the Court finds Officer Putnick to be credible, the officers nonetheless lacked reasonable suspicion to stop and frisk McDaniel.

### A.   Credibility of the Officers

McDaniel calls into question the veracity of the officers' characterization of the events by citing to several perceived inconsistencies in the officers' testimony. For example, McDaniel argues that Officer Putnick's actions were not consistent with those of an officer concerned about safety when approaching a possibly armed individual. In particular, McDaniel points to the fact that Officer Putnick approached the Hyundai alone, without his gun drawn, and engaged the occupants in conversation for two or three minutes before Officer Elsaesser arrived. Further, Officer Putnick asked McDaniel to provide identification, requiring McDaniel to reach toward

his waist area. According to Defendant, these actions indicate Officer Putnick did not hold any belief that McDaniel had a gun in his waistband.

Defendant suggests that if Officer Putnick truly believed McDaniel was armed, Officer Putnick should have approached the Hyundai with his weapon drawn and under the cover of another officer. However, there was no testimony that Officer Putnick's action violated police training or general practice. Instead, Officer Putnick's actions were reasonable under the circumstances. He initially approached the Hyundai alone. However, based on the officers' testimony, it appears Officer Grisby assumed a cover position on the opposite side of the car less than a minute later. Officer Putnick then testified that, while keeping his right hand free at all times in case he needed to draw is weapon, he asked the driver and McDaniel for identification. He further explained that he purposely engaged the occupants in conversation for a few minutes until Officer Elsaesser arrived, so that an additional officer was present when he asked McDaniel to step out of the car.[8] Just because Officer Putnick has a weapon available does not mean he is required to draw it immediately upon suspicion that he is approaching an individual who is armed. See United States v. Cooks, 168 Fed. App'x 93, 2006 WL 372350 (7th Cir. Feb. 15, 2006) (rejecting the defendant's argument that because the officer, who approached the defendant's car during a traffic stop, did not draw his weapon or call for backup, the officer could not have reasonably suspected the defendant had concealed a weapon, and stating that

---

[8] McDaniel cites another alleged inconsistency regarding this statement, pointing to Officer Elsaesser's testimony that McDaniel was already out of the car when he arrived. Specifically, Officer Elsaesser testified that he never saw McDaniel in the car. Contrary to Defendant's assertion, this testimony is consistent with Officer Putnick's testimony that he got McDaniel out of the Hyundai as soon as Officer Elsaesser pulled up.

"there is no requirement that police officers utilize every available procedure immediately or at all").

Defendant next takes issue with the fact that Officer Grisby called for a cover car rather than a backup car. Defendant claims that based on Officer Grisby's testimony, the officers would have called for backup rather than for a cover car if they believed McDaniel was armed. However, Officer Grisby did not testify that officers routinely call for backup when they merely *believe* an individual to be armed. Instead, when asked about what situations may require backup, rather than a cover car, Officer Grisby answered in the affirmative that a call for backup may be appropriate when "somebody was acting violent towards you or had a weapon in their hand." (Tr. 75:14, Nov. 30, 2006.)

Citing a third perceived problem, McDaniel points to Grisby's testimony that Officer Putnick never stated anything to him about believing McDaniel was carrying a weapon and that he instead believed that they were both concerned McDaniel might run. This does not indicate, as Defendant alleges, that Officer Putnick lied about believing McDaniel had hidden something, possibly a gun, in his waistband. If anything, it indicates that Officer Putnick was not communicating properly to Officer Grisby or that Officer Grisby simply did not hear Officer Putnick say anything about a gun. The Court finds this particularly likely given the fact that, as mentioned above, this was the first occasion that the officers had ridden together. Moreover, Officer Putnick testified that he was concerned both that McDaniel might be carrying a weapon *and* that he might run. Therefore, Officer Grisby's statement that he believed both officers were concerned that McDaniel would attempt to run is not inconsistent with Officer Putnick's testimony.

Finally, Defendant cites a number of other inconsistencies between Officer Putnick's testimony regarding what information the officers transmitted over dispatch and what information was actually entered by the dispatcher into the Computer Aided Dispatch report. The Court does not find these minor inconsistencies to have any bearing on the veracity of Officer Putnick's testimony.

**B.     Reasonable Suspicion**

McDaniel next argues that even if the Court finds the officers' testimony credible, the mere facts that McDaniel was in a high crime area, appeared nervous upon noticing the officers, and made furtive movements toward his waistband are insufficient to give rise to reasonable suspicion.  In assessing the reasonableness of Officer Putnick's belief that McDaniel was armed, the Court considers the totality of the surrounding circumstances.  United States v. Arvizu, 534 U.S. 266, 274 (2002).

Beginning with Officer Putnick's testimony that the location at which the Hyundai was stopped is a high crime area, the Court is mindful that standing alone, an individual's presence in a high crime area is insufficient to create reasonable suspicion of criminal activity.  See United States v. Caruthers, 458 F.3d 459, 467 (6th Cir. 2006).   Nonetheless, the Supreme Court has "noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a Terry analysis."  Illinois v. Wardlow, 528 U.S. 119, 124 (2000). At the hearing, Officer Putnick testified that based on his experience and knowledge, the location on Pleasant Street where the Hyundai was stopped is a high drug trafficking area.  Putnick recounted that there had been several shootings there, including an officer-involved shooting,

that the Police Department has executed several search warrants at that location, and that the SWAT team had previously been called to that very location.

The Defendant argues that the Court should not consider the Officer's description of the location as a high crime area because Officer Putnick considers the entire Over-the-Rhine area to be a high crime area, raising special concerns that racial, ethnic, and socioeconomic profiling may be motivating Officer Putnick's assessment. Indeed, the Sixth Circuit has cautioned that:

> [t]he citing of an area as "high-crime" requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity. District courts must carefully examine the testimony of police officers in cases such as this . . . We must be particularly careful to ensure that a "high crime" area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity.

Caruthers, 458 F.3d at 467-68 (quoting United States v. Montero-Camargo, 208 F.3d 1122, 1138 (9th Cir. 2000)).

While this Court agrees that it must approach with some degree of skepticism an officer's unsupported claim that any given region is known as a high crime area, Officer Putnick did not make such a claim in this case. Officer Putnick only testified to the overall nature of Over-the-Rhine on cross examination in response to Defense Counsel's targeted questions, as the following exchange demonstrates:

> Q. . . . And based on your experience, it's a very high drug trafficking area; right?
> A. Yes.
> Q. Shootings there?
> A. Yes.
> Q. High crime area?
> A. Yes, sir.
> Q. The whole Over The Rhine area there?
> A. Yes, sir.

11

(Tr. 27:14-22, Nov. 30, 2006.) The Court does not consider the above testimony to diminish Officer Putnick's specific and uncontradicted testimony regarding the nature of Pleasant Street and the particular location at which he and Officer Grisby came upon the stopped Hyundai. Accordingly, the Court will consider this factor in determining reasonable suspicion.

Like Defendant's presence in a high crime area, Defendant's nervous behavior is also insufficient, without more, to amount to reasonable suspicion. However, the Supreme Court has explained that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Wardlow, 528 U.S. at 124. In particular, the combination of nervous behavior and furtive movements made in response to police presence may contribute to an officer's suspicions. Where an officer grounds his reasonable suspicion in the observation of furtive movements, the court must carefully consider the nature of the defendant's movements to ensure that "the factor not be invoked cavalierly." Caruthers, 458 F.3d at 466. Providing further explanation as to the types of movements that may give rise to reasonable suspicion, the Sixth Circuit has noted that "[b]ending or leaning tends to be more suspicious when accompanied by some other indication of an attempt to conceal contraband or to reach for a weapon, such as arm movements or the sound of an item being moved." Id. at 467. This is precisely what occurred in the instant case. Officer Putnick observed McDaniel look at the officers with a startled expression, turn away from the officers, and then make quick hand movements toward his waist. These actions, together with the fact that McDaniel was seating in a car impeding the flow of traffic at a high crime location, could reasonably lead Officer Putnick to suspect McDaniel had attempted to conceal a weapon in his waistband.

Defendant claims that this case is indistinguishable from a United States District Court case out of Massachusetts, United States v. McKoy, 402 F. Supp. 2d 311 (D. Mass. 2004),[9] in which the court held that officers lacked reasonable suspicion to frisk the driver of a car stopped in a high crime area who appeared nervous upon spotting the officers and made hand movements toward his console. In McKoy, two plainclothes officers patrolling in an unmarked police car in a high crime area came upon the defendant's vehicle, which was stopped illegally with its front end extending into the intersection blocking a handicapped ramp. The officers brought their car to a stop next to the defendant's vehicle and observed that the defendant appeared startled and began looking from side to side and not in the officers' direction after he had already made eye contact with the officers. The officers also claimed that when the defendant made eye contact with the officers, he had leaned and moved his arm toward the console area. Id. at 313. When the officers left their vehicle and approached the defendant, they saw him move his arm again, and the officers testified that it looked as though the defendant was putting something down. The officers frisked the defendant and found 5.63 grams of cocaine. Id.

Granting the defendant's motion to suppress the seized evidence, the district court held that the officers lacked reasonable suspicion to frisk the defendant. The court stated that if it were to deny the defendant's motion, it "would, in essence, mean a determination that if an officer sees someone who has committed a traffic violation in a high crime area appear nervous and move before he is told to freeze or get out of their car, the officers can immediately frisk for

---

[9] McKoy was subsequently upheld by the First Circuit in United States v. McKoy, 428 F.3d 38 (1st Cir. 2005) and cited positively by the Sixth Circuit in United States v. Caruthers, 458 F.3d 459 (6th Cir. 2006) for the proposition that in some circumstances even furtive movements may be insufficient to give rise to reasonable suspicion.

weapons. Extending Terry this far would adopt, as a practical matter, an automatic frisk rule for anybody committing a traffic violation in a high crime area unless they exhibit no nervousness and do not move in any way." Id. at 317.

While McKoy is very similar to the instant case, it is distinguishable. For example, in McKoy, the court specifically found that the defendant's hand movements toward his console did not amount to "apparent efforts at concealment." Id. at 322. The court further suggested that the defendant's movements were equally consistent with possible attempts to turn off the radio, reach for registration, or put the car in park. Such is not the case here. Instead, McDaniel's actions – leaning away from the officers and moving his hands quickly toward his waistband – are much more indicative of an attempt to conceal contraband or a weapon. Moreover, as stated above, the fact that McDaniel resisted Officer Putnick's attempt to maneuver his hands behind his back served only to further heighten the officer's suspicion. While this case presents a close question, the Court is reluctant to hold that an officer cannot conduct a limited pat-down of an individual during a traffic stop, where that individual made certain movements indicative of an attempt to conceal a weapon on his person. In such cases a minimally intrusive frisk for weapons is justified in order to ensure the safety of the officers. See Cooks, 168 Fed. App'x 93, 2006 WL 372350 (holding that where an officer stopped the defendant for a traffic violation and subsequently observed the defendant making furtive movements inside the vehicle which the officer interpreted as possible attempts to hide a weapon, the officer would have been justified in conducting a search of the vehicle for weapons); United States v. Almond, 205 Fed. App'x 25, 2006 WL 3227860 (3d Cir. Nov. 8, 2006) ("Similarly, we have held that furtive hand movements used to conceal a weapon were sufficient to support a finding of reasonable suspicion."); United

States v. Clay, No. 05-3556, 2006 WL 1408119, at *3 (6th Cir. May 18, 2006) (unreported opinion) (holding that an officer had reasonable suspicion to stop and detain two individuals sitting in a parked car in front of an abandoned house in a high crime area after the officer observed the individuals make rapid hand movements upon seeing him.)

### III.     CONCLUSION

For the reasons stated above, the physical evidence seized in connection with the pat-down of Defendant McDaniel as well as the statements that McDaniel subsequently provided to the officers are admissible.  Accordingly, Defendant McDaniel's Motion to Suppress (docs. 18, 42) and is **DENIED**.

IT IS SO ORDERED.

        ___s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge